# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SOUND ACTION,<br><br>Appellant,<br><br>v.<br><br>WASHINGTON STATE POLLUTION CONTROL HEARINGS BOARD, WASHINGTON DEPARTMENT OF FISH AND WILDLIFE, and MARCUS GERLACH,<br><br>Respondents. | No. 57308-3-II<br><br><br><br>UNPUBLISHED OPINION |

CRUSER, A.C.J. — Marcus Gerlach owns waterfront property on which he seeks to build structures such as a dock and a bulkhead. Such work requires the approval of the Washington State Department of Fish and Wildlife (WDFW) in the form of a Hydraulic Project Approval (HPA). In 2019, WDFW approved Gerlach's application and subsequently issued an HPA.

Sound Action challenged the HPA before the Washington State Pollution Control Hearings Board (PCHB), making various arguments that the HPA did not comply with the Hydraulic Code.[1] The PCHB affirmed the issuance of the HPA. On appeal, Sound Action argues that the PCHB erred by: (1) limiting the testimony of Sound Action's Executive Director; (2) excluding federal permitting and mitigation standards as evidence; (3) concluding that Gerlach submitted a complete

---

[1] Ch. 220-660 WAC.

HPA application even though the application did not have complete information regarding construction plans or project impacts and mitigation; (4) concluding that the threshold determination issued by the City of Bainbridge Island fulfilled the HPA application requirement to submit a notice of compliance with the State Environmental Policy Act (SEPA);[2] (5) concluding that former RCW 77.55.141 (2010)[3] applied to Gerlach's application; (6) concluding that WDFW followed the proper mitigation sequence and that the project achieves no net loss, as required by the Hydraulic Code; and (7) ruling that WDFW could waive the requirement for Gerlach to submit a seagrass and macroalgae survey.

We hold that Sound Action's arguments are without merit. Accordingly, we affirm the superior court's order affirming the PCHB's decisions.

FACTS

I. BACKGROUND

*1. Parties*

Gerlach owns waterfront property located within Eagle Harbor on Bainbridge Island. Eagle Harbor is a heavily developed basin in Kitsap County within Puget Sound.

---

[2] Ch. 43.21C RCW.

[3] Former RCW 77.55.141 was repealed after WDFW accepted Gerlach's application but before it issued the HPA. *See* LAWS OF 2019, ch. 290, § 14. The statute provided that if an HPA application sought to construct a new bulkhead and met certain requirements, WDFW "shall issue a permit." Former RCW 77.55.141(2).

WDFW is responsible for issuing HPAs in accordance with the Hydraulic Code. *See, e.g.*, WAC 220-660-010. An HPA is a permit for construction of a project that will have an impact on the waters of the state. *See* RCW 77.55.011(11), (19)[4]; WAC 220-660-020.

Sound Action is a non-profit organization that seeks to protect nearshore habitat and species in Puget Sound. It carries out this work by reviewing every HPA and associated application materials for nearshore development projects to ensure that WDFW has followed the applicable regulations and best available science.

*2. Gerlach's HPA Applications*

Gerlach first applied for an HPA for construction of a new bulkhead, pier, ramp, boatlift, gatehouse, and float in August 2012. WDFW informed Gerlach that his application was incomplete because he was required to submit a SEPA determination along with his application.[5] In addition, WDFW's letter indicated that Gerlach needed to follow the proper mitigation sequence for avoiding, minimizing, and mitigating ecological impacts caused by the project.

At the same time, Gerlach had an application pending for a Shoreline Substantial Development Permit (SSDP) with the City of Bainbridge Island for substantially the same project. In March 2013, the city issued a "Notice of Administrative Decision and Mitigated Determination of Nonsignificance (MDNS)" in a combined document with a "Permit Decision" section and a "SEPA Decision" section. Administrative Record (AR) at 585. Regarding the permit, the city

---

[4] RCW 77.55.011 has been amended since Gerlach's application was received in 2016. *See* LAWS OF 2020, ch. 10, § 3. Because this amendment does not impact our analysis, we cite to the current version.

[5] RCW 77.55.021(2)(d) provides that a complete application for an HPA must include a "[n]otice of compliance with any applicable requirements of the state environmental policy act."

3

approved the "boathouse/gatehouse, retaining wall[,] and dock" subject to certain conditions, and it denied the bulkhead. *Id.* (boldface omitted). The bulkhead was apparently denied due to the city's "shoreline standards and regulations."[6] *Id.* at 1228.

Regarding the SEPA determination, the city determined that Gerlach's proposal did not have a probable significant impact on the environment so long as the mitigation conditions were followed. "This determination was made and mitigation measures were applied after review of a completed environmental checklist and other information on file with the lead agency." *Id.* at 585. This portion of the document did not mention the bulkhead, but the "Description of Proposal" in the document stated: "110 linear feet of bulkhead; a 174 foot dock with boat hoist; a 196 square foot gatehouse/boathouse; and a 50 linear foot retaining wall." *Id.* Gerlach appealed the permit decision and SEPA determination, and that litigation continued until 2018.

In April 2016, Gerlach submitted a new HPA application outlining the same overwater project. After WDFW informed Gerlach that his application was incomplete, Gerlach

---

[6] According to a declaration by the city employee who reviewed the Gerlaches' SSDP application, the bulkhead was denied for the following reasons:

> First, hard armored (i.e. concrete) bulkheads are not permitted in "marshes" habitat, and the Gerlach[e]s' site is comprised of marsh habitat.
>
> Second, shoreline standards and regulations allow for hard armored (i.e. concrete) bulkheads only where the site is experiencing serious wave erosion that is threatening the property or development, and the Gerlach[e]s' property is not experiencing serious wave erosion that is threatening any structure or development.
>
> Third, under the City's shoreline regulations and policies, hard armored (i.e. concrete) bulkheads are the limited exception, and other forms of shoreline armoring—logs, rocks or other natural materials—are the preferred form of shoreline armoring.

AR at 1228.

4

supplemented his application materials with updated and revised project plans and the MDNS from the city, which he sent on May 24, 2016. Even after receiving these supplemental materials, WDFW maintained that Gerlach's application was incomplete because he needed a valid SEPA determination and completed project plans and specifications. WDFW also communicated with at least one employee of the City of Bainbridge Island, who informed WDFW that the parties were awaiting a hearing before a Hearing Examiner on the combined SSDP and SEPA decision. Therefore, according to the employee, "there [was] not a SEPA determination on the project. Further, the City denied the bulkhead as proposed in the drawings sent (also part of the appeal)." *Id.* at 596.

In February 2019, "[a]fter review by Deputy Assistant Director Margen Carlson, WDFW determined that [a] statutorily complete application was received on 5/24/16." *Id.* at 1480. WDFW then accepted Gerlach's application and assigned it to Nam Siu, a WDFW biologist, for processing. No explanation was given as to why WDFW changed its prior determination that the application was incomplete.

WDFW first issued an HPA for Gerlach's project in September 2019. Sound Action filed an informal appeal[7] with WDFW. Based on this appeal, WDFW determined that the HPA listed incorrect dimensions for the overwater structures and that the HPA must be revised to correct these dimensions. No action was taken on any other issue raised by Sound Action's informal appeal.

WDFW issued a new HPA in January 2020. The HPA provides that it "pertains only to those requirements of the Washington State Hydraulic Code," that "[a]dditional authorization from other public agencies may be necessary for this project," and that the person to whom the HPA is

---

[7] *See* RCW 77.55.021(8)(b); former WAC 220-660-460 (2015).

issued is responsible for obtaining additional authorization from local, state, or federal agencies if required. *Id.* at 21.

## II. ADMINISTRATIVE PROCEEDINGS

Following the outcome of the informal appeal, Sound Action filed a formal appeal with the PCHB. The legal issues were articulated in the PCHB's order as follows:

(A) Was the HPA issued without a complete application and information, as required by RCW 77.55 and WAC 220-660? . . .
(B) Does the HPA contravene the bulkhead provisions of WAC 220-660-370 and RCW 77.55.141? . . .
(C) Did WDFW fail to follow the mitigation sequence required by WAC 220-660-080 and thereby authorize development that would adversely affect fish life and contravene RCW 77.55.021?

*Id.* at 1106-07.

### 1. Summary Judgment

Prior to the hearing on Sound Action's appeal, Gerlach moved for summary judgment on several issues. Relevant here, Gerlach argued at summary judgment that all required vegetation surveys were completed before WDFW issued the HPA, and that there is no eelgrass or macroalgae at the site.[8] In support of his motion, Gerlach submitted a January 2012 vegetation survey that he included in his initial HPA application materials. The survey was performed by Chad Croker, the owner of Northwest Marine. The survey did not detect the presence of eelgrass at the site.

WDFW submitted a declaration by Siu, the biologist who had been assigned to Gerlach's HPA application for processing. Siu stated that he was familiar with Eagle Harbor because he had performed work there over the years, including numerous vegetation surveys. One of these surveys

---

[8] WDFW must require an applicant to submit a seagrass and macroalgae survey as part of an HPA application for construction of a new dock or other over-water structure "unless [WDFW] can determine the project will not impact seagrass and macroalgae." WAC 220-660-350(3).

was in the area directly offshore of Gerlach's property. Siu also declared that he was able to observe the project site from the neighboring property during May 2019.[9] Siu held the opinion that there was no seagrass or macroalgae at the project site based on his observations, his experience and familiarity with Eagle Harbor, and his review of Gerlach's HPA application materials.

In response, Sound Action submitted a declaration by Amy Carey, the Executive Director of Sound Action. Carey declared that she personally reviews "every HPA permit for marine projects in the Salish Sea," which has totaled over 2,500 permits during her time at Sound Action. *Id.* at 744. Carey's declaration discussed surveys that indicated the presence of kelp and macroalgae "in close proximity" to Gerlach's property. *Id.* at 747. In addition, Carey reviewed aerial photographs of the site and claimed that these photographs show evidence of vegetation such as kelp and macroalgae.

The PCHB granted summary judgment in favor of Gerlach, ruling that WDFW properly waived the requirement for a vegetation survey because of the evidence that seagrass and macroalgae were not present at the site.[10]

*2. Motions in Limine*

Following various motions in limine, the PCHB made the following rulings relevant here.

First, the PCHB ruled that Carey did not qualify as an expert in "biology, marine biology, and nearshore or intertidal ecology, and the impacts to nearshore ecological systems from the overwater structure." *Id.* at 1143. The order reviews Carey's qualifications regarding her scientific

---

[9] Siu requested a site visit many times, but Gerlach never gave Siu permission to access his property.

[10] In the summary judgment order, the PCHB also ruled that Sound Action had standing to challenge the HPA.

knowledge, skill, experience, training, and education. The PCHB explained that Carey had not published a paper or conducted any study subject to peer review, that she had presented no certifications or other proof of formal training, and that she did not have a college degree or other degree in the sciences. After this discussion, the PCHB concluded that "Carey's experience reading scholarly articles without demonstrated practical scientific experience, knowledge, skill[,] or training in marine nearshore biology is not enough to qualify her as an expert." *Id.* at 1142. Carey was still permitted to provide expert testimony regarding the HPA process and the Hydraulic Code. At the hearing, the PCHB allowed Carey to lay foundation for scientific articles that she had reviewed, but she was not able to summarize and give opinions about the contents of the articles because such testimony was "not helpful to the [PCHB] and would not be reliable given the limitations of Carey's expertise." *Id.* at 1143.

Second, the PCHB ruled that certain exhibits, containing federal permitting and mitigation standards (relating to the U.S. Army Corps of Engineers and the Endangered Species Act), were not relevant and granted WDFW's motion to exclude them. Three of these exhibits (A-66, A-69, and A-70) were excluded prior to the hearing. At the hearing, two of the other four exhibits (A-71 and A-72) were excluded following objections to their admission.[11]

At the hearing, Sound Action sought to admit Exhibits A-71 and A-72, which were mitigation calculators pertaining to bulkheads and overwater structures, respectively. Following objections to Exhibit A-71, the presiding officer asked Carey clarifying questions, and Carey explained that the document was used to calculate project impacts, was "not a WDFW" document,

---

[11] Although the order on motions in limine states that Exhibits A-67 and A-68 were also excluded following an objection to their admission at the hearing, after review of the record, it does not appear that these exhibits were offered for admission during the remainder of the hearing.

and that she had entered the information herself. Report of Proceedings (RP) at 298. She stated that Sound Action has seen the document used in other HPA permit files. The presiding officer excluded the document as irrelevant because the issue at the hearing was "whether WDFW complied with the hydraulic code in issuing this HPA," but the document was not completed or required by WDFW. *Id.* at 301. Exhibit A-72 was excluded for the same reasons.

*3. Hearing Testimony*

Both Carey and Siu testified at the hearing, as well as Randi Thurston, a Compliance Division Manager in WDFW's Habitat Program.

When asked about the requirements for an HPA application to be considered complete, Thurston explained that WDFW tends to "let people apply and [ ] accept their application if [it has] enough information and know[s] what . . . they are proposing to do." *Id.* at 517. She said that WDFW does not delay processing an application if it lacks specific information required by the rules—such as a designation of the ordinary high waterline or a description of measures to protect fish life and habitat—because a lot of applicants do not know how to provide that information. "So, if there's missing information, [WDFW] will accept the application and then work with them to get the information [it] need[s]." *Id.* Often, after the application is accepted and has a biologist assigned to process the application, the biologist meets with the applicant to gather any additional information necessary for WDFW to issue the HPA.

Siu testified that, following his review of Gerlach's application materials, he met with Gerlach to get a better understanding of the project.

During the review process, Siu noted that the pier was wider than allowed by the applicable regulations, and he asked Gerlach if the pier design could be changed so that it was narrower.

Gerlach responded that he designed the pier to be 10 feet wide because he needed wheelchair accessibility on the pier. Siu explained that the width requirement exists because wider structures create a larger shadow, which can interfere with fish life. But Siu did not think that the pier being over the width requirement "ma[d]e that big of a difference" ecologically because a "reasonable mitigation measure" is to put more grating in the structure to counteract the larger shadow. RP at 605, 690. The HPA issued to Gerlach went "above and beyond the grating that's required" for the pier, and there was no vegetation at the site that would be affected by the shading. *Id.* at 690.

Furthermore, Siu noted that the pier could not be elevated six feet above the bed, as required by the regulations, without requiring Gerlach to build a four-foot-tall staircase to access the pier. Siu explained that the requirement for the pier to be elevated six feet was to maximize light transmission, so a hundred percent grating for the structure "was an appropriate offset" or mitigation since the pier could not reasonably be elevated six feet. *Id.* at 686.

Siu was ecologically "more conservative and protective" in crafting the terms of the permit because of Gerlach's refusal to let him do a site visit. *Id.* at 673. This included a conservative estimate for where he marked the ordinary high waterline for purposes of the bulkhead placement. Siu marked the line in a place he knew was above the ordinary high waterline so that he could "protect the resource." *Id.* at 674. Siu testified that most impacts are avoided if the bulkhead is placed at or above the ordinary high waterline, explaining, "along the lines of avoid/minimize/mitigate that mitigation sequence is at all costs, if you can, keep [the bulkhead] at the ordinary high waterline or above. If you can do that, you're avoiding most of the impacts, putting aside erosion[, b]ut most of the impacts into the intertidal and habitat infringement." *Id.* at 621. He also stated that this placement would minimize any impacts.

Based on Siu's background and review of the plans, he testified that a bulkhead placed on the ordinary high waterline would not bury or remove any critical habitat from the beach, would not change the vegetation or shoreline in a way that would result in a permanent loss of critical habitat, would not impound sediments behind the structure, and would not interfere with the beach as a migratory corridor for juvenile salmon in a way that would result in a permanent loss to critical habitat.

*4. PCHB Decision*

Following the hearing, the PCHB affirmed the HPA.

Regarding the completeness of Gerlach's application, the PCHB concluded that there was "sufficient information in Gerlach's application to meet the requirements for a minimally complete application" regarding the project plans. AR at 1113. In addition, the PCHB concluded that the SEPA determination issued by the City of Bainbridge Island "was applicable for the entire Gerlach proposal, including the bulkhead." *Id.* at 1111. The PCHB reasoned that the SEPA decision refers to the proposal, which the document described as the bulkhead, dock with boat hoist, gatehouse/boathouse, and retaining wall. The proposal, referenced in the SEPA determination, differed from the permit decision portion of the document, which listed out the separate components of the project and specifically denied the bulkhead. Furthermore, the SEPA determination explicitly included review of the environmental checklist submitted by Gerlach, which included the bulkhead.

In addressing whether former RCW 77.55.141 should apply to Gerlach's HPA, the PCHB conducted a retroactivity analysis and concluded that the triggering event under the statute was the receipt of a complete HPA application. The PCHB then walked through the required conditions

for WDFW to issue a permit under former RCW 77.55.141 and determined that these conditions were met and, therefore, that WDFW properly applied the former statute to the bulkhead component of Gerlach's application.

For Sound Action's claims that WDFW failed to follow the proper mitigation sequence and ensure no net loss to fish life, the PCHB relied on Siu's testimony in determining that WDFW followed the regulations. The order also notes that "Carey testified she had not visited the property and did not have personal knowledge of the site," whereas Siu had personal knowledge and "addressed the site-specific impacts in his testimony." *Id.* at 1126.

"In sum, Sound Action ha[d] not met its burden to show that WDFW's decision [was] not in compliance with governing law." *Id.* at 1130.

### III. APPEAL TO SUPERIOR COURT

Sound Action petitioned for review of the PCHB's order in Thurston County Superior Court. The superior court affirmed the PCHB's decisions.

Sound Action appeals the PCHB's summary judgment order, order on motions in limine, and the order on the hearing, including the findings of fact and conclusions of law in support of the order.

DISCUSSION[12]

## I. STANDARD OF REVIEW

Our review of PCHB orders is governed by the Washington Administrative Procedure Act (APA), ch. 34.05 RCW. *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 587, 90 P.3d 659 (2004); *see also* RCW 34.05.514(3), .518(1).[13] "We stand in the same position as the superior court and directly apply APA standards to the PCHB's record." *Wash. State Dairy Fed'n v. Dep't of Ecology*, 18 Wn. App. 2d 259, 273, 490 P.3d 290 (2021). Our review is, therefore, confined to the record before the PCHB. RCW 34.05.558; *Port of Seattle*, 151 Wn.2d at 587; *Wash. State Dairy Fed'n*, 18 Wn. App. 2d at 273. The party challenging an agency action bears the burden of demonstrating its invalidity. RCW 34.05.570(1)(a).

"We may reverse the PCHB's order 'where the agency has erroneously interpreted or applied the law, the agency's order is not supported by substantial evidence, or the agency's decision is arbitrary and capricious.' " *Wash. State Dairy Fed'n*, 18 Wn. App. 2d at 274 (internal quotation marks omitted) (quoting *Snohomish County v. Pollution Control Hr'gs Bd.*, 187 Wn.2d 346, 357, 386 P.3d 1064 (2016)); *see also* RCW 34.05.570(3).

---

[12] As an initial matter, Gerlach asks this court to dismiss Sound Action's appeal on the basis that it does not have standing to challenge the HPA issued by WDFW. Because Gerlach did not file a notice of cross appeal or otherwise properly challenge the PCHB's ruling on summary judgment that Sound Action has standing to challenge the HPA, we decline to consider the issue. *See* RAP 5.1(d); *Wolstein v. Yorkshire Ins. Co., Ltd.*, 97 Wn. App. 201, 206, 985 P.2d 400 (1999) ("Under RAP 5.1(d), a notice of a cross appeal is essential if a respondent seeks affirmative relief as distinguished from urging additional grounds for affirmance.").

[13] RCW 34.05.518 was amended in 2021. *See* LAWS OF 2021, ch. 305, § 2. Because this amendment does not impact our analysis, we cite to the current version of the statute.

The " 'error of law' " standard allows us to "substitute our view of the law for the agency's." *Wash. State Dairy Fed'n*, 18 Wn. App. 2d at 274 (internal quotation marks omitted) (quoting *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008)). But if a statute is ambiguous and falls within the area of the agency's expertise, "the agency's interpretation of the statute is 'accorded great weight, provided it does not conflict with the statute.' " *Port of Seattle*, 151 Wn.2d at 587 (quoting *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 790, 51 P.3d 744 (2002)). "In addition, we defer to the agency's decision on factual matters when the factual matters pertain to complex, technical issues specifically within the agency's expertise." *Wash. State Dairy Fed'n*, 18 Wn. App. 2d at 274.

An order is supported by substantial evidence where the record contains " 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.' " *Port of Seattle*, 151 Wn.2d at 588 (internal quotation marks omitted) (quoting *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000)). An agency's factual findings will be overturned "only if they are clearly erroneous . . . and we are 'definitely and firmly convinced that a mistake has been made.' " *Id.* (quoting *Buechel v. Dep't of Ecology*, 125 Wn.2d 196, 202, 884 P.2d 910 (1994)). Where a party challenges the agency's application of the law to the facts, although the factual findings of the agency are entitled to deference, "[t]he process of applying the law to the facts . . . is a question of law and is subject to de novo review." *Id.* at 588 (alteration in original) (quoting *Tapper v. Emp. Sec. Dep't*, 122 Wn.2d 397, 403, 858 P.2d 494 (1993)).

Lastly, "[a]n arbitrary or capricious action is one that is 'willful and unreasoning and taken without regard to the attending facts or circumstances.' " *Wash. State Dairy Fed'n*, 18 Wn. App.

2d at 274 (internal quotation marks omitted) (quoting *Port of Seattle*, 151 Wn.2d at 589). We will not find that an agency action was arbitrary and capricious so long as the agency " 'acted honestly and upon due consideration,' " even if we may have decided the issue differently. *Id.* (internal quotation marks omitted) (quoting *Port of Seattle*, 151 Wn.2d at 589).

## II. CHALLENGED FINDINGS OF FACT

Sound Action argues that the PCHB erred in affirming the HPA issued to Gerlach, specifically challenging conclusions of law 6-51. In support of this argument, Sound Action also argues that substantial evidence does not support the PCHB's findings of fact 6, 22, 27, 35, and 40. Having reviewed the findings, the filings included in the administrative record, the testimony from the hearing, and Sound Action's argument, we conclude all challenged findings are supported by substantial evidence.

## III. EVIDENTIARY RULINGS BY THE PCHB

Sound Action argues that the PCHB erred when it limited Carey's testimony regarding the impacts of the Gerlach project and when it excluded federal permitting and mitigation documents as irrelevant. WDFW argues that the PCHB correctly ruled that Carey lacked the scientific knowledge and training to testify about the project's ecological impacts and by excluding the documents regarding federal permitting and mitigation standards. Gerlach states that Carey was "not qualified in design, engineering, grating, and biology or ecology." Br. of Resp't Gerlach at 27. We hold that the PCHB did not err.

A. LIMITATIONS ON CAREY'S TESTIMONY

Sound Action complains that the PCHB rejected Carey's expert testimony regarding the HPA's ecological impacts "on the grounds that she had not published articles or conducted field studies about nearshore ecology." Br. of Appellant at 23.

*1. Legal Principles*

The Washington Rules of Evidence serve as guidelines for evidentiary rulings at PCHB hearings. RCW 34.05.452(2). ER 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Whether a witness may provide expert testimony is, therefore, a two-prong inquiry: the witness must qualify as an expert and the opinion must be helpful to the trier of fact. *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 102, 882 P.2d 703 (1994) (plurality opinion). If so qualified, "[a]n expert must stay within the area of [their] expertise." *Id.*

We review the PCHB's evidentiary rulings for abuse of discretion. *Port of Seattle*, 151 Wn.2d at 642.

*2. Analysis*

Here, in its ruling on motions in limine, the PCHB examined each factor from ER 702 as it related to Carey's qualifications—scientific knowledge, skill, experience, training, and education. Although it is true that the PCHB explained that Carey had not published a paper or conducted any study subject to peer review, these two issues pertained to the knowledge, skill, and experience inquiries from ER 702. The PCHB's order further explained that Carey's assertion that she had relevant training was not supported by any certification or other proof of formal training

16

and, regarding education, she did not have a college degree or other degree in the sciences. Considering all these factors, the PCHB concluded that "Carey's experience reading scholarly articles without demonstrated practical scientific experience, knowledge, skill[,] or training in marine nearshore biology is not enough to qualify her as an expert." AR at 1142. Carey was still able to provide expert testimony regarding the HPA process and the Hydraulic Code.

Sound Action claims that the PCHB "correctly recited the five methods for expert qualification," but that it abused its discretion "by conflating the diverse means by which Carey could qualify to provide expert testimony into a sole question -- whether Carey had conducted field studies or published a peer-reviewed article." Br. of Appellant at 29. But Sound Action does not dispute the PCHB's conclusion that Carey did not have practical scientific experience, knowledge, or skill. Rather, Sound Action argues that the PCHB dismissed conferences and workshops Carey attended as part of her education and training, and further asserts that her scientific knowledge and opinions are based on scientific principles gathered from these conferences, workshops, her review of scientific articles, "on-the-ground observations, and knowledge of and discussions with other scientists about their work." *Id.* at 31.

Sound Action has not established that the PCHB abused its discretion in limiting Carey's expert testimony, and not qualifying her as an expert on biology, and not allowing her to testify regarding the ecological impacts of the Gerlach project.

Sound Action further argues that the PCHB abused its discretion by allowing Carey to lay foundation for scientific articles that she had reviewed, but not allowing her to summarize and give opinions about the contents of the articles. But the PCHB determined that she only qualified as an expert on the HPA process and Hydraulic Code, and experts are required to give expert opinion

17

testimony only within the area of their expertise. *Queen City Farms*, 126 Wn.2d at 102. Accordingly, it was not error for the PCHB to prohibit Carey from opining on the contents of the scientific articles Sound Action sought to admit.

## B. FEDERAL PERMITTING AND MITIGATION STANDARDS

Sound Action argues that the PCHB erred when it excluded documents associated with federal permitting and mitigation standards, including the mitigation calculators from the Army Corps of Engineers that Sound Action sought to introduce at the hearing (Exhibits A-71 and A-72).

### 1. Legal Principles

At administrative hearings, evidence is admissible if "it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." RCW 34.05.452(1); WAC 371-08-500(1). "All relevant evidence is admissible which, in the opinion of the presiding officer, is the best evidence reasonably obtainable, having due regard for its necessity, availability[,] and trustworthiness." WAC 371-08-500. However, "[t]he presiding officer may exclude evidence that is irrelevant, immaterial, or unduly repetitious." RCW 34.05.452(1). At the hearing, the presiding officer should give due consideration to the Washington Rules of Evidence but is not bound by them. WAC 371-08-500.

As noted above, we review the PCHB's evidentiary rulings for abuse of discretion. *Port of Seattle*, 151 Wn.2d at 642.

### 2. Analysis

Sound Action argues that the excluded materials were relevant to show that the HPA fails to achieve no net loss, and that the PCHB "failed to explain why the evidence was irrelevant"

18

considering that WDFW had used the project impact calculators when evaluating other HPA applications. Br. of Appellant at 35. As explained above, three exhibits were excluded prior to the hearing, and two of the exhibits were excluded during the hearing (the other two exhibits at issue in Sound Action's brief were not offered for admission during the hearing). Sound Action argues that Carey's testimony at the hearing, regarding Exhibits A-71 and A-72, supported admission of all seven federal permitting and mitigation exhibits that were not admitted.

At the hearing, the presiding officer excluded Exhibits A-71 and A-72, the mitigation calculators, because they were not documents that WDFW completes as part of the HPA process but, rather, Carey entered the information into the forms herself based on other documents in the record. Because the issue at the hearing was "whether WDFW complied with the hydraulic code in issuing this HPA," but WDFW did not and was not obligated to use the documents, the presiding officer excluded them. RP at 301.

Sound Action argues on appeal that Carey testified that WDFW used the calculators for other HPAs. But Carey's testimony reflected that she used the calculators in her review, that the calculator pertaining to bulkheads specifically is "not a WDFW document," but that Sound Action has seen the calculators in HPA permit files. *Id.* at 298. Accordingly, Sound Action has not shown an abuse of discretion in the PCHB's exclusion of these documents. In addition, Sound Action has not shown how the exclusion of these exhibits at the hearing constitutes an abuse of discretion in the PCHB's decision to exclude the other exhibits prior to the hearing.

IV. COMPLETE HPA APPLICATION

Sound Action argues that Gerlach did not submit a complete application because the application did not contain certain required information and because there were inconsistencies

between the application materials and the HPA issued by WDFW. In addition, Sound Action argues that the MDNS issued by the City of Bainbridge Island did not reflect SEPA compliance for the bulkhead aspect of Gerlach's project because the combined SSDP permit denied the bulkhead and the MDNS is silent as to the bulkhead.

WDFW argues that the PCHB properly determined that the application was complete and that any inconsistencies between the application materials and the HPA are irrelevant because the HPA terms control. Regarding the SEPA determination, WDFW argues that the city's SEPA decision was made after review of Gerlach's environmental checklist and, therefore, included review of the bulkhead's impacts.

Gerlach argues that his plans do not need absolute specificity and that his application was complete. Gerlach does not provide any argument on the SEPA issue.

We hold that the PCHB properly concluded that the application was complete.

A. LEGAL PRINCIPLES

Relevant here, in order for an HPA application to be considered complete, it must include the following:

> (a) General plans for the overall project;
> (b) Complete plans and specifications of the proposed construction or work within the mean higher high water line in salt water or within the ordinary high water line in fresh water;
> (c) Complete plans and specifications for the proper protection of fish life; [and]
> (d) Notice of compliance with any applicable requirements of the state environmental policy act, unless otherwise provided for in this chapter.

RCW 77.55.021(2)(a)-(d). *See also* former WAC 220-660-050(9)(c)(iii)(B)-(E) (2015). WDFW does not begin processing an HPA application until it receives all information required and the application is considered complete. Former WAC 220-660-050(10)(a).

B. ANALYSIS

*1. Whether the Application Contained Adequate Information Regarding Construction Plans or Project Impacts and Mitigation*

Sound Action argues that the PCHB improperly allowed the HPA to fill information gaps left by the application. Sound Action further argues that the application did not contain complete project construction plans or information about the project impacts and mitigation.

WDFW's argument on this point is instructive. At the hearing, Thurston testified that WDFW tends to "let people apply and [ ] accept their application if [it has] enough information and know[s] what . . . they are proposing to do." RP at 517. This is because a lot of applicants do not have the technical knowledge to produce certain required documents, such as a designation of the ordinary high waterline or a description of planned measures to protect fish life and habitat. "So if there's missing information, [WDFW] will accept the application and then work with them to get the information [it] need[s]." *Id.* After the application is accepted, the biologist assigned to the application will meet with the applicant to gather the additional information necessary to issue the HPA. This is what occurred here—Siu testified that after reviewing the application materials, he wanted to get a better understanding of the project, so he met with Gerlach to clear up his confusion, including the various revisions in the materials over the years.

" '[S]ubstantial judicial deference to agency views [is] appropriate when an agency determination is based heavily on factual matters, especially factual matters which are complex, technical, and close to the heart of the agency's expertise.' " *Wash. State Dairy Fed'n*, 18 Wn. App. 2d at 284 (alterations in original) (internal quotation marks omitted) (quoting *Puget Sound Harvesters Ass'n v. Dep't of Fish & Wildlife*, 182 Wn. App. 857, 867, 332 P.3d 1046 (2014)).

Accordingly, the PCHB did not err by concluding that there was "sufficient information in Gerlach's application to meet the requirements for a minimally complete application." AR at 1113.

*2. Whether the MDNS issued by the City of Bainbridge Satisfied the SEPA Compliance Requirement*

Sound Action argues that the MDNS included in Gerlach's HPA application materials did not comply with the requirement for a complete application to include a SEPA determination because the city's permit decision denied the bulkhead and the MDNS is silent as to the bulkhead.

As noted above, an HPA application must contain a "[n]otice of compliance with any applicable requirements of" SEPA. RCW 77.55.021(2)(d). *See also* former WAC 220-660-050(9)(c)(iii)(E). "Under SEPA, before a local government processes a permit application for a private land use project, it must make a 'threshold determination' of whether the project is a 'major action significantly affecting the quality of the environment.' " *Anderson v. Pierce County*, 86 Wn. App. 290, 300-01, 936 P.2d 432 (1997) (quoting RCW 43.21C.030(2)(c)). An environmental checklist submitted by the applicant shall be considered by the agency (in this case, the City of Bainbridge Island) when making its threshold determination. WAC 197-11-315; former WAC 197-11-960 (2014). An MDNS "involves changing or conditioning a project to eliminate its significant adverse environmental impacts." *Anderson*, 86 Wn. App. at 301; WAC 197-11-350.

The City of Bainbridge Island issued its SEPA determination in a combined document with its SSDP permit decision in 2013. In the permit decision section, the city approved the "boathouse/gatehouse, retaining wall[,] and dock" subject to the conditions specified in the document, and it denied the bulkhead. AR at 585 (boldface omitted). The city's denial of the bulkhead was based on the city's "shoreline standards" that prohibited concrete bulkheads in marsh habitat and areas where the site is not experiencing serious wave erosion threatening the property,

22

and because the city prefers natural materials for shoreline armoring. *Id.* at 1228. The SEPA decision section does not specifically mention the bulkhead, but the city "determined that the proposal does not have a probable significant impact on the environment if measures to mitigate the proposal are used," and "[t]his determination was made and mitigation measures were applied after review of a completed environmental checklist and other information on file with the lead agency." *Id.* at 585.

The PCHB concluded that the city's SEPA determination "was applicable for the entire Gerlach proposal, including the bulkhead." *Id.* at 1111. This was because the SEPA decision refers to the proposal, and the document's "Description of Proposal" listed the bulkhead, boat hoist, gatehouse/boathouse, and retaining wall separately. *Id.* at 585. Because the proposal, referenced in the SEPA decision, differed from the *permit decision*, which listed out the separate components of the project and specifically denied the bulkhead, the PCHB concluded that the SEPA determination included the bulkhead. In other words, the PCHB concluded that the SEPA decision applied to the project as it was *proposed*, whereas Sound Action contends that the SEPA decision applied to the project as *approved* by the city pursuant to the permit decision. In Sound Action's view, the city would not have evaluated the impacts of the bulkhead in its SEPA review because it denied the bulkhead pursuant to the city's shoreline standards and regulations.

However, the relevant statute simply states that the applicant must submit a "[n]otice of compliance with any applicable requirements of the state environmental policy act." RCW 77.55.021(2)(d). Gerlach sought and obtained a SEPA determination from the city. The statute does not indicate that WDFW is required ensure that the applicant takes the necessary steps for development under SEPA. To the contrary, the HPA clarifies that the permit "pertains only to

those requirements of the Washington State Hydraulic Code" and that the person to whom the HPA is issued is responsible for obtaining any additional authorization from local, state, or federal agencies. AR at 21.

Furthermore, Sound Action has not presented evidence that the city did not review the impacts of the bulkhead in issuing the MDNS. As noted by the PCHB, Gerlach submitted an environmental checklist that included discussion of the bulkhead's potential impacts. The city's SEPA determination "was made and mitigation measures were applied after review of a completed environmental checklist and other information on file with the lead agency." *Id.* at 585. Sound Action has not demonstrated error in the PCHB's conclusion that Gerlach's application was complete with a valid SEPA determination as required by RCW 77.55.021(2)(d).

V. APPLICATION OF FORMER RCW 77.55.141 TO GERLACH'S PROJECT

Sound Action argues that the PCHB erred by concluding that former RCW 77.55.141 applied to Gerlach's HPA, even though that statute had been repealed effective two months before WDFW issued the first HPA. WDFW argues that it properly applied former RCW 77.55.141 to the application. Gerlach does not provide analysis on whether it was proper to apply former RCW 77.55.141 to his application. We hold that the PCHB did not err.

A. LEGAL PRINCIPLES

Former RCW 77.55.141(2) provided that WDFW "shall issue a permit with or without conditions within [45] days of receipt of a complete and accurate application" for construction of a beach front protective bulkhead, so long as the bulkhead met the conditions specified in the

statute.[14] In addition, former WAC 220-660-050(14)(b) stated that WDFW "may not deny an HPA for a project that complies with the conditions of RCW 77.55.141."

If construction of a bulkhead did not meet the conditions specified in former RCW 77.55.141, the application was to be "processed under this chapter in the same manner as any other application." Former RCW 77.55.141(3). The statute was repealed effective July 28, 2019. *See* LAWS OF 2019, ch. 290, § 14. Under RCW 77.55.021(7), WDFW may deny an HPA if a project does not adequately protect fish life.

B. ANALYSIS

Sound Action argues that, by processing Gerlach's HPA under former RCW 77.55.141, WDFW "circumvented the application of its technical rules for bulkheads" under RCW 77.55.021. Br. of Appellant at 47.

However, under the plain language of the former statute, WDFW "shall issue a permit" upon "receipt of a complete and accurate application." Former RCW 77.55.141(2). As discussed above, Sound Action has not shown any error in the PCHB's conclusion that Gerlach's application

---

[14] These conditions were as follows:

> (a) The waterward face of a new bulkhead or rockwall shall be located only as far waterward as is necessary to excavate for footings or place base rock for the structure and under no conditions shall be located more than six feet waterward of the ordinary high water line;
>  . . . .
> (c) Construction of a new bulkhead or rockwall . . . shall not result in the permanent loss of critical food fish or shellfish habitats; and
> (d) Timing constraints shall be applied on a case-by-case basis for the protection of critical habitats, including but not limited to migration corridors, rearing and feeding areas, and spawning habitats, for the proper protection of fish life.

Former RCW 77.55.141(2).

was complete. WDFW decided in early 2019 that Gerlach's application was complete, and Siu was assigned the HPA to review in March 2019. Therefore, at the time the application was being processed, the statute was in effect. Under the terms of the statute and regulations in effect when WDFW began reviewing and processing the application, WDFW was required to issue the permit so long as the bulkhead met the statutory conditions. *See* former WAC 220-660-050(14)(b) (WDFW "may not deny an HPA for a project that complies with the conditions of RCW 77.55.141."). Accordingly, Sound Action has not shown any error in the PCHB's conclusion that WDFW properly applied former RCW 77.55.141 to Gerlach's application.

## VI. MITIGATION SEQUENCE AND NO NET LOSS

Sound Action argues that the PCHB erred by concluding that WDFW considered each step in the mitigation sequence under the Hydraulic Code and by concluding that the HPA achieves no net loss of fish life. WDFW argues that the HPA adequately protects fish life and achieves no net loss by mitigating impacts likely to be caused by the project. Gerlach argues that the HPA contained sufficient mitigation measures. We hold that Sound Action has not demonstrated any error in the PCHB's ruling.

### A. LEGAL PRINCIPLES

All work subject to the Hydraulic Code "must achieve no net loss through a sequence of mitigation actions." WAC 220-660-080(3)(c). Under former WAC 220-660-030(102) (2015),

> "Mitigation sequence" means the successive steps that [WDFW] and the applicant must consider and implement to protect fish life when constructing or performing work. These steps must be considered and implemented in the order listed:
>
> (a) Avoid the impact altogether by not taking a certain action or parts of an action.

26

(b) Minimize unavoidable impacts by limiting the degree or magnitude of the action and its implementation by using appropriate technology or by taking steps to reduce impacts.

(c) Rectify the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reduce or eliminate the impact over time.

(e) Compensate for remaining unmitigated impacts by replacing, enhancing, or providing substitute resources or environments.

(f) Monitor the impact and take appropriate corrective measures to reach the identified goal.

*See also* WAC 220-660-080(1) (WDFW "defines mitigation as sequentially avoiding impacts, minimizing and rectifying unavoidable impacts, and compensating for remaining impacts.").[15]

B. ANALYSIS

Sound Action first argues that the HPA does not avoid or mitigate impacts because it does not omit "the unnecessary bulkhead" and does not require mitigation for impacts from the bulkhead. Br. of Appellant at 60.

Because Gerlach did not grant Siu permission to be on the property to take measurements, Siu was "more conservative and protective" in crafting the permit, including where he placed the ordinary high waterline. RP at 673. He placed that line where he knew to be above the ordinary high waterline to "protect the resource." *Id.* at 674. At the hearing, Siu explained that placing the bulkhead at or above the ordinary high waterline makes it so that most potential impacts are avoided. He specifically referenced the mitigation sequence in his explanation: "along the lines of

---

[15] Furthermore, "no net loss" is defined as "[s]equentially for avoiding impacts, minimizing unavoidable impacts, and compensating for" adverse impacts to fish life, loss of habitat functions, or loss of area. Former WAC 220-660-030(107)(a)-(c).

avoid/minimize/mitigate that mitigation sequence is at all costs, if you can, keep [the bulkhead] at the ordinary high waterline or above. If you can do that, you're avoiding most of the impacts, putting aside erosion[, b]ut most of the impacts into the intertidal and habitat infringement." *Id.* at 621. He also later summarized his statements, stating that the bulkhead placement minimized impacts.

Based on Siu's knowledge of the area and his review of the project plans, he testified that a bulkhead placed on the ordinary high waterline would not bury or remove any critical habitat from the beach, would not change the vegetation or shoreline resulting in a permanent loss of critical habitat, would not impound sediments behind the structure, and would not interfere with juvenile salmon migration resulting in a permanent loss to critical habitat. Sound Action has failed to show that WDFW did not properly follow the mitigation sequence regarding the bulkhead.

Sound Action further argues that the HPA fails to minimize or compensate for impacts caused by shading from the dock and pier structures.

Under the regulations for pier project designs, the bottom of a pier "must be at least six feet above the bed at the landward end," and should be no more than six feet wide. WAC 220-660-380(4)(a), (b). Sound Action complains that the HPA in this case approves a pier that reaches within 3 feet of the bed at the landward end and that is 10 feet wide. But WDFW "may modify or delete technical provisions in [the Hydraulic Code] through establishing conditions on an HPA permit when" modification or deletion of the provision will not cause a loss of or injury to fish life or to the habitat that supports fish life, or when the provision is not feasible due to site constraints. WAC 220-660-070(1).

28

During Siu's review, he asked Gerlach if the design of the pier could be changed so that it would comply with the 6-foot width requirement, and Gerlach responded that it was designed to be 10 feet wide because he needed wheelchair accessibility on the pier. Furthermore, the pier could not be elevated six feet above the bed at the landward end without requiring Gerlach to build a four-foot-tall staircase to access the pier.

Siu's understanding of the technical provision limiting the width of piers to six feet is because the wider the structure is, the larger its shadow. He explained that a "reasonable mitigation measure" for a structure that exceeds this width provision is to put more grating in the structure to then minimize the shadow. RP at 605. Because the pier went "above and beyond the grating that's required," and because there was no vegetation that would be affected by the additional shading, the width of the pier did not "make that big of a difference" regarding ecological impacts to the area. *Id.* at 690. In addition, Siu explained that the requirement for the pier to be elevated six feet was to maximize light transmission, so a hundred percent grating for the structure "was an appropriate offset" or mitigation since the pier could not reasonably be elevated six feet. *Id.* at 686.

Sound Action fails to show any error in the PCHB's decision to rely on Siu's testimony regarding these mitigation measures to impacts at the project site.

VII. WAIVER OF REQUIREMENT TO CONDUCT SEAGRASS AND MACROALGAE SURVEY

Sound Action argues that the PCHB erred by granting summary judgment on the issue that WDFW could waive the requirement to conduct a seagrass and macroalgae survey. WDFW argues that it properly waived the survey requirement due to the absence of vegetation at the project site. Gerlach does not provide any argument on this issue. We agree with WDFW.

A. LEGAL PRINCIPLES

As noted above, under WAC 220-660-350(3), WDFW must require an applicant to submit a seagrass and macroalgae survey as part of an HPA application for construction of a new dock or other over-water structure "unless [WDFW] can determine the project will not impact seagrass and macroalgae." *See also* WAC 220-660-380(3)(b)(iii).

We review summary judgment orders de novo, viewing the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 287, 481 P.3d 1084 (2021). Summary judgment is appropriate when the pleadings, affidavits, depositions, and admissions on file demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

B. ANALYSIS

During the summary judgment proceedings, Gerlach submitted an eelgrass and macroalgae survey performed by Chad Croker from 2012 which found no eelgrass observed at the site. WDFW submitted a declaration by Siu that stated he was familiar with Eagle Harbor due to his work there over the years, and that he has performed numerous vegetation surveys within the area, including the area directly offshore of Gerlach's property. Siu also discussed his observation of the project site from the neighboring property during May 2019. Based on his observation, his review of Gerlach's HPA application materials, and his experience and familiarity with the area, Siu's opinion was that there is no seagrass or macroalgae at the project site.

Conversely, Sound Action submitted a declaration by Carey, in which she discussed surveys indicating kelp and macroalgae "in close proximity" to Gerlach's property and that her

review of aerial photographs of the site showed evidence of vegetation such as kelp and macroalgae. AR at 747.

Because Carey did not actually view the site, and because the surveys she reviewed indicated the presence of kelp and macroalgae *near* the project site, but not *at* the project site, it was not error for the PCHB to rule that WDFW properly waived the survey requirements when both Siu and Croker's reviews of the site did not show the presence of eelgrass or macroalgae. *See* WAC 220-660-350(3), -380(3)(b)(iii).

## CONCLUSION

We hold that Sound Action has not established any error by the PCHB and affirm the superior court's order affirming the PCHB's decisions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, A.C.J.

We concur:

VELJACIC, J.

PRICE, J.